(173 App. Div. 425)

HAZZARD v. PHILIPS et al.

(Supreme Court, Appellate Division, Second Department. June 2, 1916.)

1. TRUSTS ☞272(3)—RIGHTS OF CESTUI—"INCOME."

Where testator left stock in trust, the income to be paid to his son until he attained the age of 30 years, and the corporation was dissolved by court order and required to dispose of certain of its holdings in subsidiary companies, which it did by forming new companies, and distributing the shares therein to its own stockholders, such shares representing only a portion of surplus accumulated by companies organized after creation of the trust, and not being increased realty value or plant

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

investment, the shares belonged to the cestui, and not the trustees, since they were a part of the "income," and not the corpus of the estate.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).

For other definitions, see Words and Phrases, First and Second Series, Income.]

2. TRUSTS ☞272(3)—RIGHTS OF CESTUI—INCOME.

In such case the period for computation of income began with the creation of the trust, and not with the forcible dissolution of the original corporation.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).]

3. TRUSTS ☞272(3)—CAPITAL AND INCOME—"WORKING PLANT"—"CAPITAL EMPLOYED IN BUSINESS."

Where a corporation was required to dissolve by court order, and a new corporation was formed, taking over the business which the court ruled the old could not engage in, the new stock being distributed to the holders of the old corporation, such new stock could not be regarded as part of the "working plant" of the old corporation, and therefore of the corpus of the trust estate in such stock, such investment of the funds of the old corporation not being "capital employed in its business."

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).]

4. TRUSTS ☞272(3)—CAPITAL AND INCOME.

In such case, the presumption is that the property transferred to the new corporation was worth only its total capitalization.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).]

5. TRUSTS ☞272(3)—CAPITAL AND INCOME.

Evidence *held* to show that an issue of stock in a new corporation represented income and surplus only of the old corporation, so that it belonged to the beneficiary of a partial life trust, and not to the trustees as part of the corpus of the estate.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).]

6. TRUSTS ☞272(3)—CAPITAL AND INCOME—EXTRAORDINARY DIVIDENDS.

The rule that extraordinary dividends payable from accumulated surplus, in cash or stock, belong to the beneficiary, and not the corpus of the trust, applies to both voluntary and compulsory distribution by the corporation.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).]

7. TRUSTS ☞272(3)—CAPITAL AND INCOME—EXTRAORDINARY DIVIDENDS.

Where, on creation of a trust in corporate stock, the corporation showed a deficit, but on court order of dissolution, thereafter made, it organized a new corporation and transferred to it certain property, though it was acquired prior to the trust, taking stock of the new corporation in payment, and it then had a large surplus, the new stock could be regarded as representing income belonging to the beneficiary, and not the corpus of the trust.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).]

8. TRUSTS ☞272(3)—RIGHTS OF BENEFICIARY—EXTRAORDINARY DIVIDENDS.

Where, after distribution of an extraordinary dividend in stock, a surplus of $30,000,000 to $18,000,000 remained, that was sufficient to protect the corpus of a trust created in a few shares of the stock.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 385; Dec. Dig. ☞272(3).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Submission of controversy between Alford R. Hazzard and William E. Philips and another, as surviving trustees of William H. Hazzard, deceased, upon an agreed statement of facts, under Code Civ. Proc. § 1279. Judgment for plaintiff.

Argued before JENKS, P. J., and CARR, STAPLETON, MILLS, and PUTNAM, JJ.

G. A. McLaughlin, of New York City (William B. Carswell, of New York City, with him on the brief), for plaintiff.

Henry A. Ingraham, of Brooklyn (George G. Reynolds, of Brooklyn, on the brief), for defendants.

MILLS, J. The following are the material facts:

On January 24, 1904, William H. Hazzard died, leaving a last will and testament, which was probated by the Surrogate's Court of Kings County March 25, 1904. By that will he left the residue of his estate to trustees therein named, who now are the defendants, in trust, to pay over the net income to his son, the plaintiff herein, from the death of his widow, who is now deceased, until the son shall become 30 years of age, which event has not yet occurred; the son being now 24 years of age, and having been entitled, at least during the year 1915, to the full income. A part of such trust estate was 30 shares of the stock of the Standard Oil Company of New Jersey. In consequence of the decision of the United States Supreme Court in 1911, in the case of Standard Oil Co. v. U. S., 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, that company distributed among its stockholders the stock which it held in certain subsidiary companies owned by it, including the Ohio Oil Company and the Prairie Oil & Gas Company; and the defendants, as such trustees, received in that distribution 18 and a fraction shares of the stock of the said Ohio Oil Company and 5 and a fraction shares of the stock of the said Prairie Oil & Gas Company.

The said Ohio Oil Company at that time had certain pipe line properties, which its management, in December, 1914, became convinced, by the decision of said court in what is known as the Pipe Line Cases, 234 U. S. 548, 34 Sup. Ct. 956, 58 L. Ed. 1459, it could not hold without violating the federal statutes, and therefore took proceedings by which said company transferred such property to a newly organized corporation, known as the Illinois Pipe Line Company, and received from such new company therefor its entire capital stock of $20,000,-000; and by vote of its stockholders the said Ohio Company distributed said stock of such new company among its stockholders pro rata, and in such distribution the defendants, as such trustees, about February 1, 1915, received and still hold 6 and a fraction shares of the stock of said new company, the Illinois Pipe Line Company.

The said Prairie Oil & Gas Company also held and operated certain pipe lines, and at the same time and for the same reason similar proceedings were taken by its stockholders and management, which resulted, about March, 1915, in defendants, as such trustees, receiving in like manner 8 and a fraction shares of the stock of the newly organized Prairie Pipe Line Company. The said pipe lines of the said

Ohio Company were constructed in 1906 and 1907, and no part of those properties existed in 1904, when the trust was created. The surplus of said Ohio Company was as follows:

| | |
|---|---:|
| December 31, 1903 | $ 8,529,495.15 |
| December 31, 1911 | 29,056,441.64 |
| At the date of the said transfer to the said Illinois Company | 68,849,427.49 |

Since the creation of the trust, no other extraordinary dividend, in cash or stock, was made by the Ohio Company, and no part of such surplus at any time represented increased value of real estate, plant investment, or securities.

The pipe lines of the Prairie Oil & Gas Company were constructed between 1901 and 1915, but the statement does not give, upon this point, any more definite information. The surplus of the said Prairie Oil & Gas Company was:

| | |
|---|---:|
| December 31, 1903 | Nothing. |
| December 31, 1904 | $ 684,751.46 |
| December 31, 1911 | 18,915,175.85 |
| When said company transferred its pipe line properties as aforesaid | 57,857,631.95 |

And the same things were true as to the character of such surplus and as to there having been no previous extraordinary dividends in cash or stock as above noted respecting the Ohio Company.

The plaintiff here claims that, as the beneficiary of said trust, entitled to the net income thereof, he is now entitled to both said allotments of stock in the said new pipe line companies, which were distributed to and received by the said defendants as such trustees in the early part of 1915, as above stated; while the defendants claim that they are entitled to hold both said allotments as parts of the principal or corpus of said trust fund, and the submission asks this court to decide that question.

[1] The latest and as well a definite expression of the Court of Appeals upon the subject of the respective rights of such a life beneficiary and of such trustees to extraordinary dividends in cash or stock declared upon the stock belonging to the trust fund is to be found in Matter of Osborne, 209 N. Y. 450, 103 N. E. 723, 823, 50 L. R. A. (N. S.) 510, Ann. Cas. 1915A, 298. The rule there laid down is summarized in the prevailing opinion, at page 477 of 209 N. Y., at page 731 of 103 N. E., 50 L. R. A. (N. S.) 510, Ann. Cas. 1915A, 298, in the following words:

"Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they intrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund."

From the application of this rule to the problem presented by the facts as to the stock of the Illinois Pipe Line Company, it seems to me clear that that stock should be regarded as income which has been earned and accumulated since the creation of the trust. The pipe lines

involved were wholly constructed after January 24, 1904, when the trust was created. At the beginning of that year the Ohio Oil Company had a surplus of more than $8,000,000, and upon the date when it transferred its pipe lines to the new, the Illinois Pipe Line Company, it had a surplus of $68,000,000 plus; and after such transfer it had remaining a surplus of $48,000,000 plus. It had before declared no extraordinary dividend, and no part of such surplus represented increased value of real estate, plant investment, or securities. In other words, during the life of the trust the surplus of the Ohio Oil Company had increased over $30,000,000, aside from the pipe line properties or the stock of the new company, which now represents those properties, and with that stock such increase was more than $50,000,-000. Therefore such increase of surplus was more than $50,000,000. Therefore such increase of surplus must represent profits of the company accumulated during such period. Matter of Rogers (2d Dept.) 22 App. Div. 428, at 438, 48 N. Y. Supp. 175, affirmed 161 N. Y. 108, 55 N. E. 393.

[2] The objections to this conclusion presented by the defendants' counsel seem to me not to be well taken. In the first place, he contends that the test of said rule should be applied upon the theory that the period for the accumulation of income should, upon the facts, be treated as beginning with the year 1911, when the enforced distribution of the stocks of the subsidiary companies, including the said Ohio Oil Company and the Prairie Oil & Gas Company, was made. I do not agree with that view. It seems to me that the true way to look at the matter is that the United States court decided in effect that the Standard Oil Company could not lawfully hold stock in the said subsidiary companies, but that, in equity, such stocks belonged to the stockholders of the Standard pro rata, and must be distributed among them accordingly, or at least might be so distributed. After that distribution was made, the stockholders of the Standard held their subsidiary company stocks just the same as they before had held their Standard stock. If any such subsidiary company had any accumulated surplus, and should at any subsequent period attempt to divide it, or any part of it, among its stockholders, the question of the respective rights of such a life beneficiary and such trustees to the surplus so distributed would have to be decided precisely as though such surplus had remained with the Standard, and then, at the same time, was distributed by it. I conclude that the date of the beginning of accumulation in the test here is January 24, 1904, the creation of the trust, and not 1911, the distribution of the subsidiary stocks.

[3] The defendants further contend that the stocks of the new pipe line companies, so received by them as trustees, should be regarded as a part of the working plant of the Ohio Oil Company and of the Prairie Oil & Gas Company, and as thereby enhancing the value of the stock of those latter companies. I do not so view the matter. The effect of the decision of the United States court is that such pipe lines did not represent or constitute lawfully a part of the working plant of either of those old companies, as they could not lawfully conduct such a pipe carrying business, but that in equity such properties belonged

pro rata to the stockholders of the old companies and must be disposed of by those companies.

Doubtless they could have sold such property for cash; and, had they done so, and then divided such cash among their stockholders, such dividend would have been subject to the application of the above-stated rule in Matter of Osborne, 209 N. Y. 450, 103 N. E. 723, 823, 50 L. R. A. (N. S.) 510, Ann. Cas. 1915A, 298. I think that the situation is no different because those old companies sold those properties for stock and then divided such stock. Such stock of the new companies, so distributed, appears to me to be subject to the application of the same rule. The situation seems to me to be precisely the same as that in Matter of Rogers, supra. The Court of Appeals in that case said:

"It is very clear that the investment in government bonds, railroad stocks, and lands in the Western states was not capital employed in the business of the corporation, and, consequently, was not necessary as a working capital." 161 N. Y. 114, 55 N. E. 394.

In like manner it seems quite clear here that the investment by those old companies in the pipe lines, which it could not lawfully employ in its business, "was not capital employed in the business of the corporation, and, consequently, was not necessary as a working capital." 161 N. Y. 114, 55 N. E. 394.

[4, 5] As to the contention further made by defendants' counsel, that the facts stated are not sufficient to warrant the conclusion that the pipe line properties so transferred did not exceed the entire surplus of the old corporation in each case accumulated during the life of the trust fund, I think that the presumption is that the properties transferred to the newly organized pipe line companies, in return for their respective stocks, were worth respectively the capitalization of such new companies, and no more, and, therefore, that we should hold that those transfers depleted the surplus of each of the old companies only by the amount of such new stocks respectively. The figures hereinbefore given as to the increase in the surplus of each such old company at different times indicate to my mind clearly that such surplus, to an amount far exceeding the distribution made by means of the stocks of the new pipe line companies, represented earnings made and accumulated during the life of the trust.

[6] Moreover, I can see no reason why the "Osborne Matter" rule, above stated, should not apply to the case of a practically enforced distribution as well as to one really voluntarily made. Here the distribution came because the stockholders had come to recognize that their directors had invested a part of their surplus earnings in pipe lines, which it was unlawful for their corporations to hold or operate.

[7] The situation as to the stock of the Prairie Pipe Line Company differs somewhat from that of the stock of the Illinois Pipe Line Company in this: That the pipe lines of the Prairie Oil & Gas Company, which were transferred by it to the Prairie Pipe Line Company, were constructed by the Prairie Oil & Gas Company between 1901 and 1915, and may, for aught that the statement declares, have been wholly acquired prior to the formation of this trust. Still it seems to me that

the situation in March, 1915, when the distribution of the stock of the Prairie Pipe Line Company was made, was such that it was competent for the stockholders of the Prairie Oil & Gas Company to treat the stock of the other, the new company, as a part of the surplus of the old company and to distribute it as such. When the trust was created January 24, 1904, the Prairie Oil & Gas Company had no surplus at all, but in fact had a deficit; and when the distribution of the stock of the Prairie Pipe Line Company was made it had more than $57,000,000 surplus, or, aside from the stock of the Prairie Pipe Line Company, more than $30,000,000 of surplus (46). It would seem plain that the proceeds of such sale of its pipe line properties, whether cash or stock of any company, might well be distributed by the Prairie Oil & Gas Company among its stockholders as a dividend of a part of its surplus earnings since the trust was created.

[8] The surplus still remaining after such distribution of the pipe line stocks in each instance, namely, upwards of $48,000,000 for the Ohio Oil Company and upwards of $30,000,000 for the Prairie Oil & Gas Company, would seem ample for each company to hold to preserve the integrity of the corpus of this trust fund. 209 N. Y. 477, 103 N. E. 723, 823, 50 L. R. A. (N. S.) 510, Ann. Cas. 1915A, 298.

I conclude, therefore, that the said stocks of the Illinois Pipe Line Company and of the Prairie Pipe Line Company rightfully belong to the plaintiff as a part of the net income of the trust fund earned and accumulated during the existence of that fund, and therefore that the controversy should be determined in favor of the plaintiff and against the defendants, and judgment rendered accordingly, without costs. All concur.